UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CATHERINE PHILLIPS, et al.,

               Plaintiffs,

                                   Case No. 2:13-CV-11370

v.

                                   HON. GEORGE CARAM STEEH

RICHARD D. SNYDER et al.,

               Defendants.

_____/

**ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANTS' MOTION TO DISMISS (DOC. #41) AND
DENYING DEFENDANTS' MOTION TO STAY PROCEEDINGS (DOC. #47)**

This action challenging the constitutionality of Michigan's Emergency Manager

Law, the *Local Financial Stability and Choice Act*, Act No. 436, Public Acts of 2012,

Mich. Comp. Laws Ann. §§ 141.1451 *et seq.* (West 2013) ("PA 436"), was commenced

by plaintiffs who include local elected officials, unelected citizens, and members of the

governing boards of various religious and civil rights organizations.  Defendants, the

Governor and Treasurer of the State of Michigan, have moved to dismiss all nine counts

alleged by plaintiffs in their First Amended Complaint.  For the reasons stated below,

defendants' motion to dismiss is GRANTED in part and DENIED in part, and

defendants' motion to stay proceedings is DENIED.

<u>PROCEDURAL MOTION</u>

Defendants move the court to stay the determination of this case pending

completion of the City of Detroit bankruptcy.  Defendants argue that a finding that PA

436 is unconstitutional would halt the Detroit bankruptcy and require the unwinding of all

the acts of Detroit's Emergency Manager.  However, the Bankruptcy Court and this court have already considered defendants' stay arguments and have determined that on balance, the pending challenge to the constitutionality of PA 436, which is actively being implemented throughout the state, should go forward.  Defendants have not raised any new arguments in their most recent motion.

First, plaintiffs' claims in this case are not directly related to the City of Detroit, and any impact on the City's bankruptcy is speculative at best.  Judge Rhodes opined that a successful challenge to PA 436 will not automatically or necessarily result in the removal of Detroit's emergency manager or the nullification of anything that has already occurred in the bankruptcy proceedings. *Order Denying Motion for Reconsideration*, *In re City of Detroit,* Dkt. # 2256.  For this reason, defendants are not able to establish that they will suffer irreparable harm absent the granting of a stay.  On the other hand, issuing a stay will cause substantial harm to plaintiffs by denying their right to proceed with a constitutional challenge that is only tangentially related to the City of Detroit or the bankruptcy.  Finally, the public has a strong interest in avoiding unnecessary delay in resolving civil rights claims, like those raised in this case.

It is this courts' determination that this lawsuit should go forward and defendants' motion to stay shall be denied.

<u>FACTS</u>

Plaintiffs bring this action under 42 U.S.C. § 1983, challenging the constitutionality of PA 436, which was enacted to address problems presented by fiscal instability among the State's local governments.  Specifically, plaintiffs allege that PA 436 violates Fourteenth Amendment guarantees of Due Process and Equal Protection;

-2-

Article IV, Section 4 of the Constitution, which provides for a Republican Form of Government; the Voting Rights Act; the First Amendment rights of free speech and to petition government; and the Thirteenth Amendment.

Prior to 1988, municipalities in Michigan that were experiencing financial difficulties could be placed into receivership by the courts.  Court-appointed receivers were compensated from the property that the courts placed within the care of the receiver.  In 1988, the State of Michigan enacted PA 101, which allowed the State to appoint an emergency financial manager over cities experiencing a financial emergency.  In 1990, the legislature replaced PA 101 with the *Local Government Fiscal Responsibility Act*, PA 72, which authorized Michigan's local financial emergency review board to appoint an emergency financial manager ("EFM") only after the Governor declared the local government to be in a financial emergency.  The EFM's powers extended to matters of finances, including the authority to renegotiate contracts, while local elected officials remained in control of administrative and policy matters.  Under PA 72, the state local financial emergency review board appointed EFMs in the cities of Benton Harbor, Ecorse, Flint, Hamtramck, Highland Park and Pontiac, as well as over the Detroit Public Schools.

In 2011, possibly in response to a court ruling finding that the Detroit Public Schools' Board, and not the EFM, possessed the power to determine what curriculum would be taught in the public schools, the governor signed the *Local Government and School District Fiscal Accountability Act*, PA 4 into law.  PA 4 repealed PA 72 and converted all EFMs into Emergency Managers ("EM"), greatly expanding the scope of their powers.  EMs could act "for and in the place of" the municipality's elected

-3-

governing body, including a general grant of legislative power.  EFMs in Benton Harbor,
Ecorse and Pontiac, as well as the Detroit Public Schools, were converted to EMs.  EMs
were newly appointed in Flint, Highland Park Public Schools and Muskegan Public
Schools.

Citizens gathered signatures to place a referendum on the ballot to reject PA 4.
The petitions were certified August 8, 2012, and by operation of law PA 4 was
suspended and PA 72 went back into effect.  All PA 4 EMs were reappointed as PA 72
EFMs.  At the general election on November 6, 2012, Michigan voters voted to reject
PA 4.

During the lame-duck session that followed the repeal of PA 4, the state
legislature passed, and the Governor signed, the *Local Financial Stability and Choice
Act*, PA 436.  PA 436 changed the title of EFMs to EMs and expanded the scope of their
powers to cover all the conduct of local government - both finance and governance.  PA
436 contains some new provisions for local government not present in previous laws,
including expanded local government options to address the financial emergency and a
procedure to remove the EM after he or she has served 18 months.  The EMs
appointed under PA 4 and EFMs appointed under PA 72 all became EMs under PA
436.  When PA 436 took effect on March 28, 2013, EMs were in place in the cities of
Allen Park, Benton Harbor, Detroit, Ecorse, Flint, Inkster, Pontiac and River Rouge, as
well as the public school districts of Detroit, Highland Park and Muskegon Heights.
Since that time, the City of Hamtramck had an EM placed in control of the city's
governance, the City of Highland Park was deemed to be in a financial emergency,
Inkster, River Rouge, Royal Oak Township and the Pontiac Public Schools have

entered into consent agreements, and the Hazel Park and East Detroit School Districts were found not to be in financial distress.  The EMs of Allen Park, Benton Harbor, Ecorse and Pontiac were replaced by "transition advisory boards" ("TAB") with governing authority returned to elected officials.  The TAB's duties and responsibilities are restricted to consulting, reviewing and approving certain financial and budget transactions.  In July of this year, an EM was appointed to run the City of Lincoln Park.

As noted, this case involves plaintiffs' claims that the sweeping powers given to Emergency Managers under PA 436 in supplanting local elected officials offend the constitution and laws of the United States.  Not implicated in this case are the multitude of state law based claims that might have been raised.

Plaintiffs assert that 52% of the State's African-American population is under the governance of an EM, a consent agreement or a TAB, while only a tiny percentage of the State's Caucasian population is under such governance.  In addition, the percentage of persons living below the poverty line in Michigan as a whole is 15.7%.  All but one of the cities with an EM have a poverty level at least double the state average. Plaintiffs allege that as a result of PA 436, a disproportionate number of African Americans and those in poverty are under the governance of an EM instead of the local officials who were voted into office.  Finally, plaintiffs allege that citizens in communities with EMs have effectively lost their right to vote or have had that right diluted to the point that it has no meaning.

<u>LEGAL STANDARD</u>

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests the sufficiency of the complaint.  Viewing the facts in a light most favorable to the plaintiff, the court assumes

that the plaintiff's factual allegations are true in determining whether the complaint

states a valid claim for relief.  *See Bower v. Fed. Express Corp.*, 96 F.3d  200, 203 (6th

Cir. 1996).  "To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft

v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S.

544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged."  *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).

<u>ANALYSIS</u>

I.  <u>Standing</u>

Federal courts "have only the power that is authorized by Article III of the

Constitution and the statutes enacted by Congress pursuant thereto," therefore a

plaintiff must possess both constitutional and statutory standing in order for a federal

court to have jurisdiction over a matter.  *Bender v. Williamsport Area Sch. Dist.*, 475

U.S. 534, 541 (1986).

Defendants challenge whether plaintiffs are proper parties to seek an

adjudication of the issues raised in the amended complaint.  This is a question of Article

III, or Constitutional, standing and goes to the issue of the court's subject matter

jurisdiction.  To survive this challenge, plaintiffs must show (1) they have suffered an

injury in fact that is (a) concrete and particularized and (b) actual or imminent, not

conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of

the defendants; and (3) it is likely that the injury will be redressed by a favorable

decision."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  It is a threshold

requirement that plaintiffs allege they have sustained, or are in immediate danger of sustaining, some direct injury as a result of PA 436.  It is not enough that plaintiff suffer an indefinite injury in common with people in general.  *Miyazawa v. City of Cincinnati*, 45 F.3d 126, 127 (6th Cir. 1995) (citation omitted).  "The injury . . . must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'"  *O'Shea v Littleton*, 414 U.S. 488, 494 (1974) (citation omitted).  Because declaratory relief is sought, plaintiffs also have the heightened burden of showing a substantial likelihood they will be injured in the future. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983).

Plaintiffs are residents of cities with EMs, elected officials of cities or school districts who have actually been displaced by EMs, voters who intend to vote again in the future, and people who are actively engaged in the political process at the local level of government.  The harms alleged by plaintiffs are unique as compared to Michigan residents living in cities without an EM.  The court notes that the sweeping powers under PA 436 appear much more expansive than those given to receivers in Pennsylvania, where standing was not found.  See *Williams v. Governor of Pennsylvania*, 552 Fed. Appx. 158 (3rd  Cir. 2014).  Plaintiffs have already suffered, and continue to suffer, the alleged constitutional deprivations, while the residents of Michigan communities without an EM have suffered no such harms.  In all instances, the alleged deprivations stem directly from the application of PA 436, and it is also true that the alleged injuries will be redressed by a decision favorable to plaintiffs.

As for meeting the heightened burden of demonstrating that they are likely to be injured in the future, each day that the elected officials who have been replaced by an EM are not able to exercise their legislative authority, the plaintiffs continue to suffer the

constitutional harms alleged.  Plaintiffs have therefore established Article III standing to bring this case.

Statutory standing requires that the statute plaintiffs invoke gives them certain rights they may enforce.  Plaintiffs do not have to demonstrate actual harm in order to show statutory standing.  Most of the plaintiffs are unelected individuals who are residents of localities with EMs appointed under PA 436.  These individuals allege their right to vote has been impaired.  Congress amended the Voting Rights Act in 1975 to confer standing upon all "aggrieved persons."  For purposes of deciding a Rule 12(b)(6) motion, it is unnecessary to determine whether plaintiffs' allegations of impairment of their voting rights are true in order to hold they have standing to seek relief.  This court ultimately finds that plaintiffs' allegations of impairment of their voting rights, under the Voting Rights Act, fail as further described below.  Nevertheless, whether or not plaintiffs have stated a viable claim is properly analyzed in assessing the sufficiency of the allegations, not as a question of standing.  The Supreme Court has held that qualified voters who have alleged they have been personally disadvantaged by a state statute can demonstrate standing to challenge the statute's constitutionality.  *Baker v. Carr*, 369 U.S. 186, 204-08 (1962) (plaintiffs are asserting "a plain, direct and adequate interest in maintaining the effectiveness of their votes," not merely a claim of "the right possessed by every citizen 'to require that the government be administered according to law . . .'" (citations omitted)).  In another case, the Court reiterated that "any person whose right to vote is impaired has standing to sue."  *Gray v. Sanders*, 372 U.S. 368, 375 (1963).  Plaintiffs are minorities who allege their right to vote has been abridged by

PA 436 because they can now only vote for local officials who are rendered impotent in that the Act takes away their elected officials' power to legislate.

The remaining plaintiffs are elected individuals who have been displaced by EMs and PA 436 Transitional Advisory Boards. They allege equal protection arguments based on their inability to remove EMs after 18 months because they were already displaced by EMs when PA 436 took effect. These plaintiffs argue they are suffering alleged constitutional deprivations, while residents of other Michigan communities without an EM suffer no such harms.

At the motion to dismiss stage, plaintiffs demonstrate statutory standing by alleging the type of harm protected by the statute under which their case is brought. Plaintiffs in this case have shown they have statutory standing to bring their claims.

II.  Substantive Due Process (Count I)

The Fourteenth Amendment protects against violations of citizens' liberty interests, which have been described by the Supreme Court as follows:

> [T]he Due Process Clause specifically protects those fundamental rights and liberties which are, objectively, "deeply rooted in this Nation's history and tradition," . . . and "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if they were sacrificed."

*Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (citations omitted). When substantive due process applies, the government must show a compelling reason that demonstrates an adequate justification for taking away life, liberty or property. The Supreme Court has invoked the concept of substantive due process for the protection of unenumerated constitutional rights including the right to work, the right to marry, the right to custody of one's children, the right to an abortion, and the right for an adult to

refuse medical care.  Each recognized right is in the nature of a privacy right.  The Supreme Court, however, has repeatedly warned against adding fundamental liberties to the substantive due process doctrine.  *See id.* at 720.

Plaintiffs allege that they have a fundamental right to vote, including the right to elect officials who possess legislative power, which has been violated by PA 436. According to plaintiffs, PA 436 has the effect of creating a voting system where citizens in communities with an EM vote for officials who have no governing authority, while citizens of other communities vote for those who actually govern and act as the elector's representatives in office.  Claiming that PA 436 has resulted in "a radical departure from prior forms of local government known in . . . the United States," plaintiffs point to the statute's uniqueness as an indication of a violation of a fundamental right.  P.A. 436 results in unprecedented disenfranchisement and vote dilution, they argue, which implicates the Due Process Clause.  *See Warf v. Bd. of Elections*, 619 F.3d 553, 559 (6th Cir. 2010).

The right to vote "is a fundamental matter in a free and democratic society." *Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964).  "Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized."  *Id.* at 562.  In *Reynolds*, which struck down Alabama's apportionment plan under the Equal Protection Clause because it was not based on current population, the Supreme Court recognized a right to vote in state and federal elections, protected by the Constitution.  The Supreme Court, in a case challenging a public school financing scheme under the Equal Protection Clause,  stated in a footnote

-10-

that "the right to vote, *per se*, is not a constitutionally protected right, . . . [but we recognize a] protected right, implicit in our constitutional system, to participate in state elections on an equal basis with other qualified voters whenever the State has adopted an elective process for determining who will represent any segment of the State's population. " *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 n.78 (1973). Indeed, going back to 1886, the Supreme Court compared the concept of the abhorrence of slavery to the protection of the political franchise, holding that both ideas are "self-evident in the light of our system of jurisprudence. . . .  The case of the political franchise of voting . . . [t]hough not regarded strictly as a natural right, but as a privilege merely conceded by society, according to its will, under certain conditions, nevertheless it is regarded as a fundamental political right, because preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

Clearly, the right to vote, once given, is to be scrupulously protected to make sure all voters are able to participate on an equal basis with other voters.  However, the Supreme Court has never recognized the right to vote as a right qualifying for substantive due process protection.  Given that plaintiffs' theory is not that they were unable to vote, but that the meaningfulness of their vote is unequal to those in localities without an EM, the proper route for plaintiffs' challenge is the Equal Protection Clause. Defendants' motion to dismiss plaintiffs' substantive due process claim in Count 1 is granted.

III.   Guarantee Clause (Count 2)

The Guarantee Clause states "[t]he United States shall guarantee to every State in this Union a Republican Form of Government . . . ."  U.S. Const., art. IV, § 4.

Plaintiffs allege that defendants violated this constitutional guarantee by appointing unelected emergency managers to their respective localities, a position not directly accountable to local voters.  This argument requires a logical step in order to prevail, because plaintiffs must show that the term "state" also refers to local governments.

The Guarantee Clause is a "guarantee to the states, as such . . . [and] does not extend to systems of local governments for municipalities."  *Johnson v. Genesee*, 232 F. Supp. 567, 570 (E.D. Mich. 1964) (citations omitted).  Since local governments are considered "convenient agencies" whose powers depend on the discretion of the state, *Reynolds*, 377 U.S. at 575, maintenance of republican form at the state level is sufficient to satisfy the Guarantee Clause.  Plaintiffs' brief cites authority which defines the term "republican" and attempts to demonstrate the justiciability of the question, but cites no authority that actually applies the Guarantee Clause to local governments. Plaintiffs have thus failed to state a valid claim as to the violation of the Guarantee Clause, because they make no claim that the political form of the state is anything but republican.  Defendants' motion to dismiss Count 2 is granted.

IV.   Equal Protection Clause

The Fourteenth Amendment of the United States Constitution provides in relevant part that "No state shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." The Supreme Court has stated that this language "embodies the general rule that States must treat like cases alike but may treat unlike cases accordingly."  *Vacco v. Quill*, 521 U.S. 793, 799 (1997). Equal protection prevents states from making distinctions that burden a fundamental right, target a suspect class, or intentionally treat one individual differently from others

-12-

similarly situated without any rational basis.  *Radvansky v. City of Olmstead Falls*, 395

F.3d 291, 312 (6th Cir. 2005).  To state an equal protection claim, a plaintiff must

"adequately plead that the government treated the plaintiff 'disparately as compared to

similarly situated persons and that such disparate treatment either burdens a

fundamental right, targets a suspect class, or has no rational basis.'"  *Ctr. for Bio-Ethical*

*Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (citations omitted).

Plaintiffs make four equal protection claims: PA 436 (1) unduly burdens their

fundamental right to vote, (2) has a discriminatory impact on African American

populations, (3) has a discriminatory impact on lower-income communities, and (4)

discriminates based on the status of previously having an appointed emergency

manager under PA 72 or PA 4.

    A. <u>Burden on the Right to Vote (Count 3)</u>

    Plaintiffs argue that their fundamental right to vote has been denied, abridged,

and/or diluted by PA 436 because governing authority is stripped from local elected

officials and transferred to one unelected EM with no accountability to local citizens.

First Amended Complaint ¶ 123.  Furthermore, since local decisions in such

communities are now made by a direct appointee of the State, plaintiffs argue, voters

across the entire state wield voting power over them, but the reverse is not true: "the

entire state electorate participates in the selection of the local government in the

affected municipalities and school districts, while in all other localities across the state,

local residents alone directly vote for their local elected officials."  First Amended

Complaint ¶ 125.  Finally, plaintiffs maintain that PA 436 is not narrowly tailored to

address the asserted government interest of achieving financial stability for local governmental units.

There is a constitutionally protected right for citizens "to participate in state elections on an equal basis with other qualified voters whenever the State has adopted an elective process for determining who will represent any segment of the State's population." *Rodriguez*, 411 U.S. at 35 n.78. The right to vote underlies our republican form of government. "As long as ours is a representative form of government, and our legislatures are those instruments of government elected directly by and directly representative of the people, the right to elect legislators in a free and unimpaired fashion is a bedrock of our political system." *Reynolds*, 377 U.S. at 562. "Any unjustified discrimination in determining who may participate in political affairs or in the selection of public officials undermines the legitimacy of representative government." *Kramer v. Union Free Sch. Dist.*, 395 U.S. 621, 626 (1969).

This case does not present a traditional burden on the right to vote because all qualified voters are actually able to vote in their local elections. Rather, the complaint made by plaintiffs is that the officials they elect do not have the powers attendant to their office because essentially all such legislative and executive powers are vested in an appointed individual.

The Constitution does not compel a particular method of choosing state or local officers or representatives. *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 9 (1982). The Supreme Court has addressed the issue of whether the members of a county board of education could be appointed rather than elected. *Sailors v. Board of Education*, 387 U.S. 105 (1967). The Court's analysis started with the fact that political

-14-

subdivisions of states "have been traditionally regarded as subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental function."  *Id.* at 107-08 (citing *Reynolds, 377 U.S. 533*).  These local governmental units are "'created as convenient agencies for exercising such of the governmental powers of the state, as may be entrusted to them,' and the 'number, nature and duration of the powers conferred upon (them) * * * and the territory over which they shall be exercised rests in the absolute discretion of the state.'"  *Id.*  The Court concluded that, as such, "state or local officers of the nonlegislative character" do not have to be elected. Rather they may be appointed by the governor, the state legislature, or by some other means rather than by election.  *Id.* at 108.  The *Sailors* Court found that the county school board members perform "essentially administrative functions," and expressly reserved the issue "whether a State may constitute a local legislative body through the appointive rather than the elective process."  *Id.* at 109-110.          A few years later, the Supreme Court considered a challenge to the constitutionality of a statutory method for the election of trustees of a junior college apportioned among school districts throughout the state based on the number of students living in each district.  The Court rejected the notion of distinguishing between elections for legislative officials and administrative officials, in favor of the more general category of officials who perform "governmental functions."

> Such a suggestion would leave courts with an equally unmanageable principle since governmental activities 'cannot easily be classified in the neat categories favored by civics texts,' [citation omitted] and it must be rejected.  We therefore hold today that as a general rule, whenever a state or local government decides to select persons by popular election to perform governmental functions, the Equal Protection Clause of the

> Fourteenth Amendment requires that each qualified voter must be given
> an equal opportunity to participate in that election . . . .

*Hadley v. Junior College Distr. Of Metropolitan Kansas City, MO*, 397 U.S. 50, 55-56

(1970).  The Court thus blurred the lines between administrative and legislative officers,

requiring compliance with *Reynolds*' "one man, one vote" where officials who perform

governmental functions are selected by election.

Pursuant to PA 436, EMs are given the power to "act for and in the place and

stead of the governing body and the office of chief administrative officer of the local

government."  Mich. Comp. Laws Ann. § 141.1549(2) (West 2013).  Once an EM is

appointed, "the governing body and the chief administrative officer of the local

government shall not exercise any of the powers of those offices except as may be

specifically authorized in writing by the emergency manager . . . and are subject to any

conditions required by the emergency manager."  *Id.*  Thus, contrary to defendants'

characterization, the EM is granted expansive legislative powers in addition to executive

powers under PA 436.  Mich. Comp. Laws Ann. § 141.1552 (West 2013).  In essence,

PA 436 authorizes the State of Michigan to replace locally elected officials performing

governmental functions with an appointed EM.

The right to vote at the local level arguably has even more impact on the lives of

citizens than it does at the state or federal level.  Mayors and city councils enact the

laws most immediately affecting citizens.  Voters are still likely to know their local

representatives, who are their neighbors, who hold town hall meetings, and who have a

unique understanding of the views of their constituents.  Where local communities do

not have government officials who are answerable to the voters, there are serious

-16-

shortcomings and likewise serious concerns. This case implicates the rights of citizens to elect the local officials who will in fact carry out the duties of elected office.

The court must reconcile the fact that the plaintiffs in this case were actually able to vote for the legislative representatives in their districts, with their claim that by appointing an EM, PA 436 rendered elected officials virtually powerless. On the one hand, PA 436 does not suspend local elections, does not alter the local election process, and does not affect voter registration requirements. Plaintiffs do not, and cannot, claim a denial or impairment of their right to vote for elected officials. On the other hand, if the right to vote is to mean anything, certainly it must provide that the elected official wields the powers attendant to their office.

The Supreme Court has only gone so far as to hold that there is a constitutionally protected right to participate in elections on an equal basis with other qualified voters in the jurisdiction. *See Rodriguez,* 457 U.S. 1 (1982); *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). The Supreme Court has had multiple opportunities to find a fundamental right to vote, and has passed each time. There are plenty of compelling arguments that the right to vote should be a fundamental right, but it is not this court's place to extend the law. The ability to vote on equal footing when the franchise is extended is what is protected, and the weight of the vote must be equal to that of other voters. No cases go beyond this protection of the right to vote. The voters in jurisdictions with EMs have the same voting opportunity as all other voters in that jurisdiction, and it is not appropriate to compare the voters in jurisdictions with appointed EMs to those in jurisdictions without EMs.

-17-

Public Act 436 seeks to put local governments on better financial footing. It does this by appointing an EM in jurisdictions where the Governor and State Treasurer have determined that the local government was experiencing a financial emergency. The Act does not take away a fundamental right to vote, because such a right has never been recognized by the courts.

Plaintiffs' challenge to PA 436 as it relates to giving appointed EMs the governmental functions traditionally belonging to elected officials is subject to rational basis review. The statute is given "a strong presumption of validity" and the state must demonstrate a "reasonably conceivable state of facts that could provide a rational basis" for the law. *Heller v. Doe*, 509 U.S. 312, 319-20 (1993). This standard is highly deferential. *Doe v. Michigan Dept. of State Police*, 490 F.3d 491, 501 (6th Cir. 2007). Justice Powell was cognizant of the court's reserved role in relation to the state legislature's role with regard to reform legislation:

> Of course, every reform that benefits some more than others may be criticized for what it fails to accomplish. But we think it plain that, in substance, the thrust of the Texas system [of public school financing] is affirmative and reformatory and, therefore, should be scrutinized under judicial principles sensitive to the nature of the State's efforts and to the rights reserved to the States under the Constitution."

*San Antonio v. Rodriguez*, 411 U.S. at 39.

PA 436 is based on the legislative finding that the authority and powers conferred by the Act constitute a necessary program and serve a valid public purpose - the fiscal integrity of the State's local governments and the health, safety and welfare of its citizens. Mich. Comp. Laws Ann. § 141.1543(a) (West 2013). On its face, PA 436 applies equally to all jurisdictions in the state, and is invoked when certain indicators of

-18-

financial stress are present.  Defendants' equal protection challenge to PA 436 in Count 3 is therefore subject to rational basis scrutiny.

To survive rational basis scrutiny, PA 436 need only be "rationally related to legitimate government interests[,]" *Doe v. Mich. Dep't of State Police*, 490 F.3d 491, 501 (6th Cir. 2007), and "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Comm'ns, Inc.*, 508 U.S. 307, 313 (1993).  "When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 440 (1985); *Sailors*, 387 U.S. at 109 ("Save and unless the state, county, or municipal government runs afoul of a federally protected right, it has vast leeway in the management of its internal affairs.")

This court recognizes Michigan's legitimate government interest in preventing or rectifying the insolvency of its political subdivisions.  Mich. Comp. Laws Ann. §141.1543 (West 2013) (finding it necessary to protect the credit of the state and the fiscal stability of the local governments in order to protect the health, safety, and welfare of the citizens of the state).  The court thus finds that PA 436 survives rational basis review. Defendants' motion to dismiss Count 3 is granted.

B.  Discrimination Based on Race (Count 4)

Plaintiffs assert that the disproportionate impact the appointment of emergency managers has had on African Americans establishes an equal protection claim. By plaintiffs' calculations, over 52% of Michigan's African Americans are under emergency

manager authority pursuant to the enactment of PA 436, compared to two percent of Michigan's Caucasian citizens.  Plaintiffs argue that as applied, PA 436 invidiously discriminates between similarly situated groups in the exercise of their fundamental rights, and should thus be subject to strict scrutiny.  Defendants, on the other hand, argue that rational basis is the appropriate standard because the law is facially neutral, and plaintiffs have not alleged facts raising a plausible inference of discriminatory intent. They also argue that PA 436 and its application pass rational basis scrutiny, so plaintiffs have failed to state an equal protection claim for racial discrimination.

The Constitution's equal protection requirement does not invalidate a facially-neutral law "simply because it may affect a greater proportion of one race than of another."  *Washington v. Davis*, 426 U.S. 229, 242 (1976).  Disparate impact "is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination."  *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977). However, a facially neutral law with a legitimate purpose can still violate the Equal Protection Clause if that law "had a discriminatory effect . . . and was motivated by discriminatory purpose." *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 533-34 (6th Cir. 2002) (citing *Wayte v. United States*, 470 U.S. 598, 608 (1985)).

Invidious discriminatory intent is an impermissible justification for state action, which triggers strict scrutiny.  *See Arlington Heights,* 429 U.S. at 265-66 ("When there is a proof that a discriminatory purpose has been a motivating factor in the decision, [judicial] deference is no longer justified."); *Yick Wo*, 118 U.S. at 373 ("Though the law itself be fair on its face . . . if it is applied and administered by public authority . . . so as

practically to make unjust and illegal discriminations between persons in similar circumstances . . . the denial of equal justice is still within the prohibition of the Constitution.").  A plaintiff need not demonstrate racial discrimination was dominant in the reasoning for state action to trigger strict scrutiny, but only that it was a motivating factor.  *United States v. City of Birmingham*, 727 F.2d 560, 565 (1984).

Since it is inherently difficult to prove discriminatory intent, as legislators rarely admit to it, claimants may use a number of objective factors to determine the existence of such intent. *Id.* (citing *Arlington Heights*, 429 U.S. at 266-68.  For example, proof of discriminatory impact may demonstrate unconstitutionality in "circumstances [in which] the discrimination is very difficult to explain on nonracial grounds." *Batson v. Kentucky*, 476 U.S. 79, 93 (1986). The legislative or factual history may also be relevant, as well as any procedural or substantive departures from the state's usual course of action. *Arlington Heights*, 429 U.S. at 266-68.  Additionally, and most important to this case, claimants may also use statistics to demonstrate the absence of a rational, nonracial purpose for a certain policy.  *Farm Labor Org. Comm.*, 308 F.3d at 534 (citations omitted).

At the motion to dismiss stage, plaintiffs need only state a *plausible* claim for relief.  *Iqbal*, 556 U.S. at 678.  Since statistical evidence can be used to demonstrate unconstitutional discriminatory action, plaintiffs at this stage must plead some facts that demonstrate the plausibility that emergency managers have been appointed in an intentionally discriminatory manner.  The First Amended Complaint states that 52% of Michigan's African American population resides in cities with an EM, a consent agreement, or a transition advisory board.  At the same time, only about 2% of

Michigan's white citizens live in communities governed by an EM.  PA 436 has been applied to multiple municipalities of different sizes and jurisdictions, and almost all of them are predominantly black.

Additionally, the Michigan Department of Treasury maintains a scoring system to determine the financial health of the state's cities and townships.  The latest information available from the state is for fiscal year 2009.  Fiscal indicator scores between 5 and 7 place a municipality on a fiscal watch list, while scores between 8 and 10 result in the community receiving consideration for review.  However, six out of seven communities (85%) with a majority population of racial and ethnic minorities received EMs when they had scores of 7.  At the same time, none of the twelve communities (0%) with a majority white population received an EM despite having scores of 7 or higher.  Defendants argue that these statistics are old and of no application to PA 436, but the history of state intervention makes it reasonable to assume that similar statistics are available in discovery to support plaintiffs' claims regarding the pattern of decision making.

There are twelve factors that may be considered by state authorities in assessing whether a local government is eligible for appointment of an EM, yet only one factor is necessary to serve as the basis for state intervention.  This confers enormous discretion to state decision makers and creates a significant potential for discriminatory decisions.  This court is satisfied that at this juncture plaintiffs have pleaded a plausible equal protection claim based on the racial impact of PA 436's implementation.  Defendants' motion to dismiss Count 4 is denied.

-22-

C.  Discrimination Based on Wealth (Count 5)

Plaintiffs' third equal protection claim relates to alleged wealth discrimination. Plaintiffs claim that the implementation of PA 436 has yielded disproportionately more emergency manager appointments in lower-income communities.  Plaintiffs maintain that PA 436 therefore conditions a citizen's right to vote in local elections on the wealth of their community.  Defendants argue that the general wealth of a community does not determine whether an emergency manager is appointed, but rather the financial situation that they currently exhibit.  *See* Mich. Comp. Laws Ann. § 141.1544 (West 2013).  Defendants contend that regardless, wealth-based classifications do not discriminate against a suspect class, and therefore rational basis scrutiny is appropriate.

Whenever a state "makes the affluence of the voter . . . an electoral standard," it violates the Equal Protection Clause.  *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 666 (1966) (finding poll tax unconstitutional under Equal Protection Clause).  The Supreme Court explained that an individual's voting ability and qualifications have "no relation" to his or her wealth, and "to introduce wealth . . . as a measure of a voter's qualifications is to introduce a capricious or irrelevant factor."  *Id.* at 668.  "The degree of the discrimination is irrelevant."  *Id.*  In fact, the Supreme Court has explicitly confirmed that all voters have an equal right to vote, "whatever their income."  *Gray*, 372 U.S. at 380.  Therefore, strict scrutiny will apply when the ability to vote is restricted by wealth. *Harper*, 383 U.S. at 669.

In this case there is no restriction on the plaintiffs' ability to vote based on their wealth.  Plaintiffs do not contend that they are required to pay a poll tax or any other

-23-

fee, or that they must demonstrate their wealth in some other way, before they are permitted to vote in local elections.

Furthermore, PA 436 does not use the wealth of individual citizens, or even the community as a whole, to determine whether an EM is appointed. Rather, it is the overall financial condition and prognosis of a local unit of government that will subject it to review and the possible appointment of an emergency manager. Any community whose financial books are not in order is subject to review under PA 436, regardless of the relative wealth of that community. How a community's resources are managed will be reviewed in making the determination whether to appoint an EM. Mich. Comp. Laws Ann. § 141.1547(1) (West 2013).

Plaintiffs have not alleged a valid, plausible claim of wealth discrimination. Defendants' motion to dismiss Count 5 is granted.

### D.  Discrimination Against Localities with Emergency Manager Appointed Under Previous Laws (Count 9)

Under PA 436, after a particular EM has been in office for 18 months, he or she can be removed upon the approval of the chief executive and 2/3 vote of city council or the school board. If this occurs, the local government may negotiate a consent agreement with the state treasurer. If a consent agreement is not agreed upon within 10 days, the local government shall proceed with the neutral evaluation process set out at Mich. Comp. Laws Ann. § 141.1565 (West 2013). The neutral evaluator's job is to facilitate a settlement or plan of readjustment between the local government and "interested parties." The neutral evaluation process can last for a maximum of 90 days following the date the neutral evaluator is selected. The process ends with either a

settlement of all pending disputes, or a resolution of the local government recommending that the local government proceed under Chapter 9.

Plaintiffs' fourth and final equal protection claim concerns localities that were under emergency manager authority *before* the effective date of PA 436.  Plaintiffs in those localities assert unequal treatment because, despite their time under emergency manager authority pursuant to PA 72 and/or PA 4, they must wait an additional 18 months after the enactment of PA 436 to engage in the removal process.  Mich. Comp. Laws Ann. § 141.1549(6)(c) (West 2013).  Plaintiffs argue that this imposes *more* than an 18-month wait period for certain localities, in comparison to a locality that was not previously under emergency manager authority, which must only wait 18 months.  The equal protection rights violation identified by plaintiffs is that they are treated differently than similarly situated persons in localities placed under EM governance after the effective date of PA 436, and that such disparate treatment burdens the fundamental right to vote.

Plaintiffs identify the similarly situated groups as localities governed by EMs originally appointed prior to PA 436's effective date and those governed by EMs appointed after PA 436's effective date.  The court, however, does not conclude that the two groups are similarly situated for purposes of equal protection analysis.

There is a clear difference between the powers of an emergency financial manager under PA 72 and an emergency manager under PA 436.  Thus, a new 18-month limitation on removal is a rational means to the legitimate end of allowing such an emergency manager time to oversee the enactment of policies in the new areas of authority.  The court does acknowledge that emergency managers under PA 4 enjoyed

essentially the same authority as they do under PA 436.  However, the revival of PA 72 during the referendum significantly diminished emergency manager authority, which was again expanded upon the enactment of PA 436.  Given this period of flux in the scope of emergency managers' authority, it is rational for the state legislature to restart the clock on the removal wait period.  Even if the two groups compared by plaintiffs were similarly situated, PA 436's 18-month provision passes rational basis scrutiny.

Plaintiffs have therefore failed to state a valid equal protection claim on behalf of localities with emergency manager authority originally appointed under PA 72 or PA 4.  Defendants' motion to dismiss Count 9 is granted.

V.   Voting Rights Act (Count 6)

Section 2 of the Voting Rights Act prohibits any jurisdiction from using racially discriminatory voting practices and procedures resulting in disenfranchisement of minority voters.

> (a)  No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color . . .
>
> (b)  A violation of [this prohibition] is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [race] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

42 U.S.C. § 1973.

Plaintiffs allege that by providing for the appointment of emergency managers in a way that diminishes African American voting power, PA 436 is a "standard, practice, or procedure" that violates Section 2 of the Voting Rights Act.  Specifically, plaintiffs

allege that PA 436 abridges their right to vote in local elections where EMs have been appointed because the elected officials' governing authority in those locales is "substantially removed, circumscribed, and conditional."  Plaintiffs cite the same statistics cited in their race equal protection claim, asserting that emergency managers have been appointed in a disproportionately high number of areas with large African American populations, while predominantly white municipalities in similar financial distress do not have an EM imposed by state action.

The fundamental problem with plaintiffs' argument is that PA 436 is not a "standard, practice or procedure . . . which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race . . . ."  Plaintiffs do not take issue directly with the voting system in which local officials are elected.  They are not alleging that there was an impediment to their ability to vote, such as an identification requirement, a felon disenfranchisement provision, or a problem with polling locations or hours.  Rather, plaintiffs take issue with the fact that citizens in municipalities under emergency management have a vote that does not mean anything since the officials they elect have no decision-making authority.

The Supreme Court distinguishes between changes in a standard, practice or procedure directly affecting voting by the electorate and "changes in the routine organization and functioning of government."  *Presley v. Etowah County Commission*, 502 U.S. 491, 504 (1992).  While the latter may indirectly affect voting, such organizational changes are not within the scope of Section 2 of the Voting Rights Act.  Although *Presley* actually addressed the scope of Section 5 of the Voting Rights Act, its analysis applies to Section 2 because the Court defined terms that are embodied in

both sections: "voting qualification or prerequisite to voting, or standard, practice, or procedure" with respect to voting. *See Holder v. Hall*, 512 U.S. 874, 882 (1994) (Kennedy, J.) ("[T]he coverage of §§ 2 and 5 is presumed to be the same.")

In *Presley*, the Supreme Court held that the Voting Rights Act applies only to a change in a standard, practice, or procedure that has a "direct relation to, or impact on, voting." *Id.* at 506. The Court observed that it recognizes four types of changes that meet the "direct relation" test: those that (1) "involve[] the manner of voting"; (2) "involve candidacy requirements and qualifications"; (3) "concern[] changes in the composition of the electorate that may vote for candidates for a given office" or (4) "affect the creation or abolition of an elective office." *Id.* at 502–03 (citations omitted). "The first three categories involve changes in election procedures, while all the examples within the fourth category might be termed substantive changes as to which offices are elective." *Id.* at 503.

The *Presley* plaintiffs were newly elected black commissioners who argued that a transfer of duties among and away from elected officials pertaining to repairs and discretionary spending for road maintenance within two Alabama county commissions constituted "changes" that had a direct relation to voting, and, thus, required preclearance under Section 5 of the Act. The first alleged change took away the commissioners' discretion to allocate funds as needed in their districts and instead put all funds in a common account to be doled out based upon needs of the county as a whole. The second alleged change transferred authority concerning road and bridge

operations from the elected county commissioners to an appointed county engineer who answered to the commission.

The Court held that these changes did not fit within any of the four categories recognized as having a direct relation to voting. The first alleged change "concern[ed] the internal operations of an elected body." *Id.* at 503. "Changes which affect only the distribution of power among officials are not subject to § 5 because such changes have no direct relation to, or impact on, voting." *Id.* at 506. Perhaps more on point to the case pending before this court, the second alleged change was also found not to be a voting practice or procedure because even if "the delegation of authority to an appointed official is similar to the replacement of an elected official with an appointed one", it did not "change[ ] an elective office to an appointive one." *Id.* at 506–07. Both before and after the change, the county voters could elect their county commissioners. The same holds true in this case. Before and after the enactment of PA 436, the electorate can elect their city council members and mayors.

In 1994, the Supreme Court addressed a Section 2 Voting Rights Act challenge to the size of the Bleckley County, Georgia Commission. *Holder*, 512 U.S. 874. Bleckley County always had a single-commission form of government, but the state legislature authorized the county to adopt by referendum a multimember commission consisting of five members elected from single-member districts and a chair elected at-large. Voters defeated the proposal to adopt a multimember district, which prompted a challenge by black voters who wanted a chance to elect a commissioner to represent their allegedly cohesive district. A majority of the Supreme Court held that the size of a governing body is not subject to a vote dilution challenge under Section 2 of the Voting

Rights Act.  The plurality opinion explained that in order to find liability in a Section 2 case, a court must find a reasonable alternative practice as a benchmark against which to measure whether the existing voting practice results in vote dilution.  *Id.* at 880.  They Court opined that this was problematic for plaintiffs because "[t]here is no principled reason why one size should be picked over another as the benchmark for comparison." *Id.* at 881.  The plurality concluded that "a plaintiff cannot maintain a § 2 challenge to the size of a government body . . . ."  *Id.* at 885.  Justices Thomas and Scalia concurred with this holding, but emphasized that "[o]nly a 'voting qualification or prerequisite to voting, or standard, practice, or procedure' can be challenged under § 2" and concluded that the size of a governing body is not a "standard, practice, or procedure" within the terms of section 2.  *Id.* at 892.

This court has considered the state of local elections in the challenged jurisdictions before and after PA 436 became effective.  In replacing elected officials with an appointed Emergency Manager, PA 436 changes the decision-making authority of elected officials.  PA 436 concerns both the internal operations of an elected body and the distribution of power among officials.  Such changes, though dramatic and meaningful, are not changes in voting standards, practices, or procedures to render PA 436 subject to Section 2 of the Voting Rights Act.  The court does not take plaintiffs' challenge lightly, and is cognizant that the Voting Rights Act is to be given "'the broadest possible scope,'" and that the Act "'was aimed at the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right to vote because of their race.'"  *Id.* at 895 (quoting *Allen v. State Bd. Of Elections*, 393 U.S. 544, 565, 567 (1969)).

-30-

Plaintiffs in this case challenge a temporary reorganization of government, not a voting standard or procedure.  The residents of affected communities in this State retain their voting rights and can again repeal the enactment as they did its predecessor; or they can simply replace the state officers who ignored voter sentiment in enacting Act 436.  This political process remains the correct means for redress rather than attempting to restructure government under the auspices of the Voting Rights Act.  The problem is one that must be addressed through the political process as opposed to bringing a challenge under the Voting Rights Act.  Defendants' motion to dismiss Count 6 is granted.

VI.   First Amendment Claims (Count 7)

 A.   Viewpoint Discrimination

Plaintiffs assert that defendants engaged in viewpoint discrimination by enacting PA 436, which suppressed the viewpoint expressed by the citizens' referendum on PA 4.  According to plaintiffs, the government has violated the First Amendment by regulating speech based on its substantive content, and suppressing particular views, on the subject of how to remedy financial exigencies of local governments.  Defendants argue that no viewpoint discrimination has occurred because the state government engaged in the proper governmental process of enacting a law.

Viewpoint discrimination violates the First Amendment when it regulates speech based on substantive content.  *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995).  However, legislative action supportive of a given policy choice does not necessarily constitute viewpoint discrimination, otherwise all governmental action would be unconstitutional.  Instead, viewpoint discrimination reaches

unconstitutionality when it "favors one speaker over another." *Id.* When the State

enacted PA 436, it did not abridge the speech rights of any group based on their

message. This logic is explained in *Michigan Farm Bureau v. Hare*:

> [W]hen an act of the legislature is referred, that particular act is suspended
> in its operation, but that such [s]uspension does not deprive the
> [l]egislature of the right thereafter to pass . . . [or] deal with exactly the
> same subject as the referred act, and in the same manner, but subject, of
> course, to the same right of reference as was the original act.

379 Mich. 387, 398 (1967). Michigan residents who voted to reject PA 4 have no less

ability to express their opinions or petition the state government to overturn PA 436. As

noted in the last section, those individuals retain their opportunity to reject PA 436

through referendum in the next election. Enacting a law that has been previously

referred is brow-raising because it is politically dubious, not because it is

unconstitutional. Plaintiffs have made no valid claim to unconstitutional viewpoint

discrimination.

    B. <u>Freedom of Speech</u>

    Plaintiffs claim that their speech rights were violated when defendants appointed

an emergency manager to their local government, effectively removing their previously

elected local officials. Defendants argue that no abridgement of the freedom of speech

has occurred because PA 436 provides both "voice and choice." Citizens have "voice"

because they can advocate for the removal of the emergency manager or appeal the

decision under PA 436 to appoint an emergency manager. They also have "choice"

because once a locality is declared financially unstable, PA 436 provides the local

government with a choice between an emergency manager, a consent agreement, a

neutral evaluation process, and bankruptcy.

"Congress shall make no law . . . abridging the freedom of speech . . . ."  U.S. Const., amend. I.  The "first amendment protects . . . the right of citizens to band together in *promoting* among the electorate candidates who espouse their political views."  *Cal. Democratic Party v. Jones*, 530 U.S. 567, 574 (2000) (emphasis added).  Freedom of speech doctrine is implicated when issues of advocacy and expression are raised.  An invalid abridgement of this right entails a governmental action that prevents an individual from demonstrating or promoting an idea, whether symbolic or expressive.  *See, e.g.*, *Stromberg v. Cal.*, 283 U.S. 359 (1931) (invalidating a law prohibiting the flying of a red flag as an abridgment of symbolic speech).  Nothing in plaintiffs' pleadings suggests that plaintiffs are any less able to freely and openly advocate for a certain state or local policy.  Thus, plaintiffs have not met the threshold of a valid speech abridgement claim.

Plaintiffs cite to an Eighth Circuit case, *Peeper v. Callaway Cnty. Ambulance Dist.*, 122 F.3d 619 (8th Cir. 1997), for the proposition that limiting a local officeholders' power amounts to a limitation of speech rights for the officeholders' constituents.  However, in *Peeper*, the court used rational-basis review to find that the removal of the single board member was irrational and therefore invalid.  *Id.* at 623.  Here, the removal of local governments' decision-making authority pursuant to PA 436 is rationally related to the legitimate governmental interest of solving financial crises.  Therefore, plaintiffs have not shown that defendants' actions amount to an invalid abridgment of their freedom of speech.

-33-

C.  Right to Petition Government

Plaintiffs' final First Amendment claim relates to their ability to petition their own local government.  Plaintiffs argue that appointing an emergency manager who is not directly accountable to local citizens prevents those citizens from petitioning their local government.  Defendants argue that no violation has occurred because plaintiffs' petition rights do not extend to local government, plaintiffs can still petition local officials to remove the emergency manager, and plaintiffs can petition their state government to amend PA 436 or any related legislation.

States are free to make decisions regarding the political control of localities as long as the state citizens are free to "urge proposals" to the state.  *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 73-74 (1978).  This is because states have final authority over local matters: "Municipal corporations are political subdivisions of the state, created as convenient agencies for exercising such of the governmental powers of the state as may be instructed to them."  *Hunter v. City of Pittsburgh*, 207 U.S. 161, 178 (1907).  "[U]ltimate control of every state-created entity resides with the State . . . [and] political subdivisions exist solely at the whim of their state."  *Hess v. Port Authority Trans-Hudson Corp.*, 513 U.S. 30, 47 (1994) (citations omitted).  The limitations on this power exist at the borders of constitutional limits: for example, the state may not intentionally discriminate among localities in a manner that violates the Equal Protection Clause.  Additionally, the Petition Clause does not require that the state actually respond to citizen petitions; it only requires that the state allow its citizens to make the government aware of its views.  *Confora v. Olds*, 562 F.2d 363, 364 (6th Cir. 1977)

-34-

("[N]either in the First Amendment nor elsewhere in the Constitution is there a provision guaranteeing that all petitions for the redress of grievances will meet with success.").

Plaintiffs have not alleged that defendants prevented them from petitioning the state government. Despite their claim that the emergency manager is politically unaccountable, plaintiffs have the power to petition their locally elected officials to remove the emergency manager. Other options are available as well: they can petition the state government to alter state law, can promote and elect state representative candidates who promise to repeal or amend PA 436, and can bring a referendum petition to invalidate PA 436. Plaintiffs have failed to state a valid claim that defendants violated their constitutional right to petition their government.

VII.   Thirteenth Amendment Claim (Count 8)

Plaintiffs' final claim is that defendants' actions amount to a vestige of slavery in violation of the Thirteenth Amendment. Plaintiffs argue that the allegedly discriminatory implementation of PA 436 amounts to the disenfranchisement of African Americans in Michigan, which is an unconstitutional incident or badge of slavery. Section One of the Thirteenth Amendment states: "Neither slavery not involuntary servitude . . . shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. amend. XIII. Section Two states: "Congress shall have power to enforce this article by appropriate legislation." *Id.* Plaintiffs bring this count under 42 U.S.C. § 1983, meaning they claim that defendants' actions amount to a direct violation of the *first* section of the Thirteenth Amendment, and not any federal statute enabled by Section Two. Thus, in order to state a claim for relief, plaintiffs must demonstrate that defendants' actions

-35-

have imposed a badge of slavery or involuntary servitude upon African American residents of Michigan.

In *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968), the Supreme Court ruled that the Thirteenth Amendment enables Congress to prohibit "badges and incidents of slavery" when they include "restraints upon 'those fundamental rights which are the essence of civil freedom . . .'" *Id.* at 441 (citations omitted). The question of whether the Thirteenth Amendment itself could be found to prohibit such vestiges of slavery was not determined. In *City of Memphis v. Greene*, 451 U.S. 100 (1981), the Court revisited the question whether courts may strike down state action pursuant to Section One of the Thirteenth Amendment when the action amounts to an incident or badge of slavery. The Court acknowledged it may be an "open question whether § 1 of the [Thirteenth Amendment] by its own terms did anything more than abolish slavery." *Id.* at 125-26. However, the *Greene* Court found it unnecessary to make a determination on that question because the state action at issue, closing down a street in Memphis in a way that effectively segregated races within the city, could not be "fairly characterized as a badge or incident of slavery." *Id.* at 125-26. The Court started with the proposition that the city council had wide discretion in making policy decisions regarding traffic flow and safety. Any inconvenience to motorists was a function of where they lived and drove, not of their race. The Court recognized that closing streets will always impact one area more than another, and because neighborhoods are often characterized by a common ethnic or racial heritage, "a regulation's adverse impact on a particular neighborhood will often have a disparate effect on an identifiable ethnic or racial group." *Id.* at 128.

The Court concluded that the impact of closing the street "is a routine burden of citizenship; it does not reflect a violation of the Thirteenth Amendment." *Id.* at 129.

The alleged infringement in *Greene* was that the street closing deprived African Americans of access to their property equal to the access enjoyed by white citizens. In this case, the right allegedly infringed by the state action is the right to vote. As discussed throughout this opinion, plaintiffs have not lost their right to vote. Not only is there no restraint on plaintiffs' ability to vote in local elections, the power of the entire political process is available to them to attempt to effectuate any changes to the restructuring of government imposed upon them by PA 436. Plaintiffs remain free to voice their dissatisfaction with PA 436 at town hall meetings, or through protests and letter writing campaigns to newspapers and their representatives. They can initiate new legislation through a petition process, or use the referendum procedure to reject PA 436, as was successfully done with the previous version of the emergency manager law, PA 4. Finally, voters can force a recall election to remove legislators who are unresponsive to their views. With every device in the political arsenal remaining available to plaintiffs, a law directed at temporarily reorganizing local government for the purpose of addressing a serious fiscal concern cannot be characterized as a vestige of slavery.

Plaintiffs have failed to state a plausible cause of action for a violation of the Thirteenth Amendment. Defendants' motion to dismiss Count 8 is granted.

## CONCLUSION

Plaintiffs have failed to state a claim for relief on all counts except for their allegations that PA 436 violates the Equal Protection Clause by treating similarly

situated persons differently in a manner that has a disproportionate impact on a suspect class, that being African American citizens.  Therefore, defendants' motion to dismiss is GRANTED as to Counts 1, 2, 3, 5, 6, 7, 8, and 9, and DENIED as to Count 4 of plaintiffs' First Amended Complaint.  In addition, defendants' motion to stay proceedings is DENIED.

Dated:  November 19, 2014

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on November 19, 2014, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk